919 A.2d 1200

**Terry HALEY a/k/a Antoine Haley**

v.

**STATE of Maryland.**

**No. 36, Sept. Term, 2006.**

Court of Appeals of Maryland.

March 21, 2007.

Allison Sayers, Asst. Public Defender (Nancy S. Forster, Public Defender, Stacy W. McCormack, Asst. Public Defender, on brief), for petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, *WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

The primary issue we must decide in this case is whether the Court of Special Appeals erred in holding that the attorney-client privilege does not extend to information provided by a criminal defendant to his defense attorney that would later form the basis of his defense at trial because such information was intended to be disclosed to a third party. We shall hold that information provided by petitioner to his defense attor-

---

* Wilner, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

ney, under the circumstances presented in this case, is protected by the attorney-client privilege even though the information would later form the basis of his defense at trial.[1]

This Court granted a writ of certiorari on June 14, 2006 to consider two questions:

1. Did the Court of Special Appeals err in holding that the attorney-client privilege does not extend to information provided by a criminal defendant to his defense attorney that would later form the basis of his defense at trial because such information was "intended to be disclosed to a third party?"

Where the only description of the suspect involved in a carjacking is a "black female with long hair" wearing a "multi-colored shirt," did the officer in this case have probable cause to arrest the petitioner, a black male with short hair, several hours later based primarily on the fact that he was wearing the same shirt?

393 Md. 245, 900 A.2d 751 (2006).

## I.

### A.

On August 1, 2003, Baltimore City Police Officer Nicholas Bingham received a call at approximately 2:15 a.m. for an in-progress carjacking in the area of the I–895 interchange at Shell Road an d Chesapeake Avenue in Baltimore City.[2]

---

1. Petitioner argues also that his arrest was not supported by probable cause. In light of our holding that petitioner is entitled to a new trial because the attorney-client privilege was breached by the prosecutor during cross-examination of petitioner, we will address the probable cause issue.

2. In reviewing the grant or denial of a motion to suppress evidence under the Fourth Amendment, an appellate court considers only the information contained in the record of the suppression hearing and not the record developed at trial. *Swift v. State*, 393 Md. 139, 154, 899 A.2d 867, 876 (2006). Officer Bingham was the only witness to testify at the suppression hearing, and we base our review of the motion to suppress on his suppression hearing testimony, which is presented in Part A of this section.

Officer Bingham was working the midnight to 8:00 a.m. patrol shift, was in uniform, and was driving a marked car. The dispatcher described the car as a dark four-door with a Maryland license plate number LRN–381 and indicated the direction the car was reported to be traveling. When Officer Bingham arrived at the interchange area, he immediately observed a vehicle driving toward him that matched the description given by the dispatcher. When the vehicle was two to three car lengths away, the Officer confirmed that the license plate number matched the description of the vehicle involved in the carjacking.

Officer Bingham blocked the suspect's car and tried to force it to stop. As soon as Officer Bingham angled his patrol car on Shell Road to create an obstacle for the other vehicle, "the vehicle in question that was coming directly at me made a sharp right-hand turn ... more of a hook than a right-hand turn." While the driver executed the turn, Officer Bingham "got a clear profile shot of the" driver. Officer Bingham stated that the driver's shirt was "multi-colored and just stood out inside the vehicle ... It's hard to describe. It's kind of like a western color. Like a brown, orange, sunset type colors, I would describe it as." Officer Bingham also testified on cross-examination at the motion to suppress that the shirt stood out in his memory because "I have one that's similar ... it's like a, western colors like—the colors of the sunset ... kind of like rectangular squares like bricks stacked, but not stacked in form but just stacked throughout." The driver was the only occupant in the car.

Officer Bingham pursued the vehicle after the car completed the U-turn and took off at a high rate of speed. The area traveled was described by Officer Bingham as "heavy industry known for chemical facilities." Officer Bingham added that the area consisted of "mainly warehouses and fuel storage and transfer facilities for like gasoline and diesel fuel." At that time of night, Officer Bingham reported that the type of traffic was "usually ... tanker trucks and maybe light personal vehicle traffic going to and from the facilities." According to

Officer Bingham, it was "highly unusual to see any pedestrians in the area unless they are working in that vicinity."

Officer Bingham pursued the car for several blocks but lost sight of it momentarily when it turned onto Remley Street, which "is a very bad road" because it is "semi-paved." The suspect's vehicle created a large cloud of dust when it turned. As a result, Officer Bingham backed off slightly. As the dust cleared, Officer Bingham saw that the suspect's vehicle had left the roadway and crashed into a series of trees. The driver was not in the car when Officer Bingham arrived at the car, and he did not see the driver leave the car because there was too much dust. The Officer looked inside the vehicle and found a butcher knife five to six inches in blade length on the floor of the passenger's side.

Officer Bingham radioed for additional units, including a K–9 unit and a helicopter, to assist in the search for the driver. Officer Bingham also requested the units that were at the scene with the victim to bring the victim, Leroy Singer, to the scene in order for him to identify his vehicle. When the units arrived, Singer identified his wrecked car and the police secured the area. Officer Bingham was in the area of the crash for approximately one hour while the police attempted to locate the driver. During that time, Officer Bingham spoke with employees of a trucking company and requested them to call the police if they saw anybody unusual or "a person in a multi-colored shirt."

When the police were unable to locate the driver, the vehicle was towed back to the crime lab at the police station. Officer Bingham returned to the police station to complete required paperwork and obtain the crime lab report. The victim was transported back to his residence. While waiting for the crime lab, Officer Bingham received an anonymous telephone call at approximately 6:20 a.m. indicating that "the person the police were looking for is walking on Shell Road near Chesapeake" Avenue. Officer Bingham returned to the Shell Road area with his lights and siren activated and saw a person walking on the road. Officer Bingham testified that "once I

got to the vicinity of Shell Road and Chesapeake Avenue I observed a female, appeared to be a female wearing a multicolored shirt that, to me, just stood out and matched exactly what I had seen earlier, but she had shorter hair." Officer Bingham got out of his car and ordered that person to stop. Because the suspect did not stop, but continued to walk, Officer Bingham drew his service weapon and ordered the person to the ground and to stop. Officer Bingham then "approached the suspect, put [the person] on the ground and placed [the person] in handcuffs for my safety." On cross-examination, the Officer stated that, "initially I wanted that person stopped and I wanted to approach that person trying to figure out if, indeed, it may have been my suspect initially." He stated that "there was no doubt in my mind that this individual was the same person operating the vehicle involved in the carjacking," explaining as follows:

"The shirt the individual was wearing matched to a T and the general body shape and form, build, matched that of the operator of the vehicle. And in the area which I located the person at 6:20 in the morning is not traveled by pedestrian traffic at all unless they are working in that area."

Officer Bingham pointed out that the individual was within walking distance, probably five or six blocks, from the scene of the crash. Officer Bingham noted that the individual's hands and legs had "small cuts that would be consistent with sticker bushes or maybe twigs." Inside a purse carried by the suspect, Officer Bingham found a female wig, black in color, that matched the hair on the head of the operator that was driving Mr. Singer's vehicle.

## B.

The central issue at trial was the credibility of witnesses. Haley testified on his own behalf and presented a version of events that differed significantly from Singer's version.[3] Le-

---

**3.** At the time of trial, Singer was sixty-eight years old and employed as a part-time truck driver. Haley was thirty-seven years old and worked as a home daycare provider.

roy Singer testified that he left his home at eight or nine in the evening and went to a bar called Janet's to watch a baseball game on the evening of August 1, 2003. At approximately 2:00 a.m., he left the bar in his Marauder Grand Marquis and began the three to four mile drive back to his home. As Singer drove along Patapsco Avenue, he "saw this girl waving me down, which I thought she was in trouble."[4] Singer described the individual as a black female, wearing "an orange type shirt." Believing that it was somebody in trouble, Singer stopped his car. Officer Bingham testified that, at the time of the accident, Singer had described the individual as having shoulder length black hair wearing "a multi-colored shirt" with "reds, browns, and blues in it."

Once inside the front passenger seat of the car, the individual asked Singer if he wanted to have a good time. According to Singer, the woman offered sex, and, in response, he told her to get out of my car. The individual then pulled out a butcher knife and stated: "Give me all your money." The female also put the knife to Singer's throat and threatened to cut him from ear to ear. Singer responded that h e would give her his money, but added that he only had $20 in his possession and that it was in his pocket. As he took off his seatbelt and reached for his pocket, Singer testified that he saw a cab coming up the street. When the cab approached, Singer jumped out of his car and ran for the cab. Singer yelled to the cab driver, Lester Smith, "help, call the police, I'm being carjacked," and that his assailant had a knife. In the meantime, the female took control of Singer's car and fled the scene.

Singer testified that the cab driver told Singer that he would call the police and follow the carjacker. The cab driver then drove off after Singer's car. Singer was unable to call the police because he left his cell phone in the console of his

---

**4.** Singer reported that the individual was a woman, but it was later determined at trial that the individual was a man wearing a female wig with long black hair. Singer referred to the individual who entered his vehicle alternatively as "he" or "she" throughout his testimony.

car, but he walked to a corner store and called the police. The police arrived about ten minutes later and informed Singer that they had found the car and wanted him to identify it. The police also brought Singer to the police station later that morning and asked Singer to identify two or three people in a show-up. Singer did not immediately recognize Haley and commented to an officer that a girl with long hair had entered his car. When the officer put the wig on Haley, Singer recognized him right away.

At trial, Singer identified petitioner as the person who entered his car, threatened him with a knife, demanded his money, and drove off with his car. In addition, Singer identified the knife recovered from his car as the one that petitioner had used to threaten him.

Officer Bingham testified on cross-examination at trial that Singer had advised him that he was on Patapsco Avenue because he was attempting to solicit sex from a prostitute. Officer Bingham confirmed that Singer had told him that a woman flagged him down, he stopped, and the woman got in his car. The woman asked if he would like "to have some fun." Officer Bingham related that Singer had said he asked, "how much?" The passenger stated "50 dollars." Singer indicated that was too much and asked the female to exit his vehicle. According to Officer Bingham, Singer never informed Officer Bingham that he had stopped because he believed that the woman was in distress.

On cross-examination, Singer stated again that he had stopped because he believed a woman was in trouble; he denied that he had stopped to pick up a prostitute. He also denied informing the police that he had asked "how much?" in response to the individual's offer to have a good time. Furthermore, Singer denied ever having seen petitioner prior to the incident.

Lester Smith testified that he was driving his cab on the morning in question, heading westbound on Patapsco Avenue, when he noticed a car that was not moving and an older man standing outside of the car saying help me. Smith drove past

the vehicle, then turned around and came back so that the driver's side of his vehicle was beside the driver's door of the other vehicle. According to Smith, Singer asked Smith to call the police because there was a "woman in his car that wouldn't get out ... this woman has a knife." Smith described the older man as very nervous and upset.

As Smith began to dial 911 on his cell phone, he noticed that the female in the front passenger seat of the other vehicle was moving to the driver's side. She rolled down the window, put her head out the window, and said, "all I want is my money and I'll give him the car." When asked to describe the woman, Smith stated that she had long blackish dark hair and was wearing "a red blouse with a black jacket." The woman then sped away with the victim's vehicle. Smith testified that "she took off fast. Spun wheels and just took off."

Smith made a U-turn and began to follow the car while still talking to the dispatcher, but was unable to keep up with the vehicle. Before losing sight of the vehicle, however, he informed the dispatcher of its license plate number and the direction it was headed. In addition, Smith noted that the vehicle had entered an area with only two exits and waited for the arrival of an officer. When the officer came on the scene, Smith saw the vehicle again and pointed it out to the officer. The officer turned on the patrol car's emergency lights and pursued the vehicle. At trial, after petitioner donned the wig, Smith identified Haley as the individual he saw in Singer's vehicle on the morning in question.

Haley testified at trial. Haley stated that he and Singer had been dating off and on for over a year or so. According to Haley, he first met Singer while prostituting, and said that they had been dating off and on ever since. Petitioner related that, "every other Thursday leading to Fridays, like at 2:00 a.m., he will meet me down by Harbor Hospital out my way near Hanover Street, pick me up, take me to his house." At Singer's house, Haley testified, they would engage in sexual activity, drink, and watch nasty videos.

Haley recalled that Singer picked him up at about 2:00 a.m. on the morning in question near Harbor Hospital. After they obtained drugs, they went to Singer's house, where Haley took his clothes off, the two drank and got high, and started kissing. Eventually, they left Singer's house to find an open bar because Haley was hungry and Singer wanted to get more beer. Haley testified that Singer told him to drive because Singer was intoxicated. Haley noted that he normally drove when he was with Singer.

Haley stated that, while driving, he was teasing Singer that he was going to tell Singer's son about their relationship. Haley testified that an argument ensued and that he became really serious because he was tired of frequently hiding, literally, in Singer's closet when Singer's son and neighbors would visit. Haley stated that he did not feel that he should have to hide just because Singer didn't want to reveal their relationship.

Haley testified that eventually Singer told him to stop the car and he did so in the middle of the street. Singer stated that he was going to catch a cab. When a cab came by, Singer approached it and Haley drove away. Haley denied carrying a knife that morning or holding a knife to Singer's throat.

Haley also reported that the speed pills he had taken started hitting him after he drove off. Haley claimed he had no recollection of the police pursuing him or crashing and bailing out of Singer's car, but that "I seen a lot of lights but I didn't know what they was because when you are on [the pills] you see lights anyway." Haley testified that he did remember being arrested by the police and that he had complied with Officer Bingham's order to get on the ground.

In an effort to demonstrate an ongoing relationship with Singer, Haley described the outside of Singer's residence, the area surrounding the residence, items inside the residence, and Singer's dog.[5] Over objection, the State was permitted to

---

**5.** Additional facts regarding the aspects of the case described in this paragraph will be presented infra, Part I., Section C.

question Haley about when he relayed information about his familiarity with Singer's house and dog to his defense counsel. A defense investigator, Gary Woodruff, also testified about various pictures he had taken of the exterior of Singer's residence. Woodruff's photographs were admitted into evidence. Finally, Singer was questioned about his residence, his neighborhood, and his dog.

## C.

On the morning of the trial, May 11, 2004, Haley's defense counsel requested that the court permit the jury to view the interior of Mr. Singer's house or, in the alternative, permit defense counsel's investigator to videotape or photograph the interior of the house. The trial court asked what rule would permit a viewing of Singer's house and noted that existing photos could be subpoenaed if timely requested. Defense counsel responded:

"Unfortunately, because of the difficulty that we had,[6] as Your Honor is aware of, in communications between myself and my client, I was not able to subpoena any photographs as I was unaware of this. However, just so Your Honor knows, what I did do was I asked an investigator to go out there this morning to photograph the outside of the house and to knock on the door to see if Mr. Singer would allow our investigators to take photographs so that we could avoid this. They were denied entry into the house which, at that point is his absolute right to do."

Defense counsel offered the following explanations for the late request:

"As the Court is well aware, based upon the difficulties we had yesterday, there was a serious lack of communication

---

6. At the motions hearing on May 10, 2004, Haley expressed a desire to discharge his attorney, stating that "I don't know if he's going to be with me or against me." The trial court adjourned for fifteen minute recess to enable Haley to speak with his attorney. After the recess, Haley indicated that he would like his attorney to continue to represent him.

between myself and Mr. Haley. We were finally able to resolve that issue yesterday in the courtroom and to continue on and *there was information that he provided to me yesterday, and once I received that information, I acted on it as diligently as I possibly could."*

The trial court reserved ruling on the subpoena request until the following day. The next morning, defense counsel asked to substitute one of his investigators as a witness because that investigator had taken photographs of the exterior of the victim's home and saw the victim's dog. At a bench conference on the matter, the parties discussed this request with the trial judge. The discussion proceeded, in pertinent part, as follows:

"[Court]: I think I know where this is going. If it's going where I think it's going, aren't you making yourself a witness? Because you have information that your client doesn't have.

"[Defense Counsel]: No, Your Honor. He relayed information to me about things that were in the house and also—let me—Mr. Singer has a dog. Mr. Haley described it as a miniature collie. When [defense counsel's investigator] went to the house to knock on the door and he talked to Mr. Singer, he saw the dog. Now, [the investigator] doesn't know the type of dog but he said it was a small dog that was tan and white. He doesn't know the brand. But that becomes relevant. He has the information.

"[Court]: I understand that, but why is [the prosecutor] not entitled to put you on the stand to say you didn't tell your client that? You've made yourself a witness.

"[Defense Counsel]: He relayed the information. I'm telling you as an officer of the Court I had no idea what he had and I haven't spoken to Mr. Haley today. I hadn't spoken to him yesterday before *I got this information at about right after we left your Court at whatever it was, like 4:20 in the afternoon* and the time I have seen Mr. Haley today is right here. And I can tell you as an officer of the Court, that I have not relayed any of that information, nor have I

showed him any of the photographs that [the investigator] provided to me yesterday, which I got yesterday while we were conducting our voir dire while Mr. Haley was standing up here and has never seen."

The trial court denied the request to allow the jury to view the interior of the home.

At a later bench conference, the trial court heard further argument on whether defense counsel could substitute one of his investigators as a witness. Defense counsel asserted as follows:

"Obviously if we can establish that Mr. Haley and Mr. Singer knew each other through these things,[7] because already Mr. Singer has denied knowledge of him, then that certainly would go to whether or not, in fact, Mr. Haley's version of events is the true version. And, so, it's extremely relevant and important to Mr. Haley's defense."

The trial court permitted defense counsel's investigator to testify regarding the photographs he had taken of the exterior of Singer's house. However, the trial court admonished defense counsel for investigating a case in the middle of trial, making untimely requests, and putting himself in the position where he might be a witness in the case. The following colloquy took place at the bench:

"[Court]: Still think there is an issue of whether or not the [prosecutor] can call you [defense counsel].

"[Prosecutor]: I know, Your Honor. There has been so much going on here. He's questioning the investigator.

"[Court]: This is what happens when you [defense counsel] investigate a case in the middle of a trial.

"[Prosecutor]: He's giving information to the investigator, asking what was seen and said and what's been said or done.

---

7. Defense counsel was referring to Haley's reported knowledge of Mr. Singer's dog and house.

"[Defense Counsel]: Well, Your Honor, I mean, while, I suppose that [the prosecutor] could do that, I mean, I'm telling you as an officer of the Court that I would not present a defense in which I purposely tainted or fabricated.

"[Court]: I accept that, [defense counsel], but I am not sure the State has to accept that.

"[Defense Counsel]: I understand that. Further, it is my reputation and my credibility here. I am not going to put it on the line for that. And let me just in all candor, quite frankly, I was shocked at about half of the stuff that he's told me and what has come to fruition thus far. And, unfortunately, he did not disclose this information much sooner. And, I mean, you know, it's his bed and he has to lie in it, I suppose, but it could have the potential, if what he's saying is, in fact, true, that an innocent person could be going to jail and, so, while this might be unorthodox, I mean, I really at this point have some legitimate concerns about what—legitimate concerns about what he has told me and what has come true so far."

The State did not call defense counsel as a witness.

Haley testified about his relationship with Singer and his knowledge of Singer's home and his dog. On cross-examination, the prosecutor questioned Haley about his testimony, and it is this testimony that we review for breach of attorney-client privilege. The cross-examination proceeded as follows:

"[Prosecutor]: Mr. Haley, this incident happened August 1st, 2003, correct, last summer on August 1st, correct? That's when all this happened?

"[Defendant]: That's what the report says.

\*     \*     \*

"[Prosecutor]: *Isn't it true, Mr. Haley, that all this information about the house and everything like that you never brought up any of that information with your attorney until 4:30 yesterday afternoon?*

"[Defense Counsel]: Objection, Your Honor.

"[Court]: Overruled.

"[Defendant]: I been—in the beginning, I didn't know if I wanted him as my attorney when I first met him. So, the initial report, when he first came to see me back in—

"[Prosecutor]: Your Honor, I would ask he answer.

"[Defense Counsel]: Objection, Your Honor.

"[Defendant]: I told him about where I was at the house.

"[Court]: Approach, counsel.

"(Whereupon, the parties approached the Bench and the following proceedings ensued on the record.)

"[Court]: Basis.

"[Defense Counsel]: Getting into privileged communication. Whatever happened between attorney and client is privileged information. And just because he takes the stand doesn't mean he waives his right.

"[Court]: She's not asking for the contents of any information he gave you. He just told us the contents. He testified to it. She's asking when he told you.

"[Prosecutor]: He stated on the record for the last 24 hours about all of his privileged communications.

"[Court]: Objection overruled.

"(Whereupon, the following proceedings were held in open court in the presence and hearing of the jury.)

"[Prosecutor]: I ask you again, Mr. Haley, this happened, this event, happened almost a year ago, correct?

"[Defendant]: Yes.

"[Prosecutor]: *And yet all this information about the house, your relationship with Mr. Singer, you only told your attorney about it yesterday afternoon.*

"[Defendant]: That's not true.

"[Prosecutor]: You told your—

"[Defendant]: My initial report when he first came, or some lady came to see me, I don't know who she was, Your Honor, some lady came to see me and took a report back last year sometime, and I told her the same thing, was explaining to her how—

"[Defense Counsel]: I object.

"[Defendant]: So, I don't know why—

"[Defense Counsel]: There is an objection, Mr. Haley.

"[Court]: Basis.

"[Defense Counsel]: Privileged communications.

"[Court]: Overruled. Sit down.

"[Prosecutor]: *The question is, did you tell your attorney sitting at that table only yesterday about this relationship that you had?*

"[Defendant]: No.

"[Prosecutor]: *Is it your testimony that you told him before yesterday afternoon?*

"[Defendant]: I told him, like, when I was here in April.

"[Prosecutor]: No further questions."

Petitioner was convicted of robbery, second-degree assault, theft of property valued at $500 or more, unauthorized use of a motor vehicle, and theft of a motor vehicle. He was sentenced to a term of fifteen years incarceration on the robbery charge; the remaining convictions were merged for sentencing purposes.

Haley noted a timely appeal to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed. The court held that because Haley's information was "intended to be disclosed to third parties," the attorney-client privilege was not breached and therefore, even though this was not the ground relied on by the trial court in permitting the cross-examination of petitioner, there was no trial error. The intermediate appellate court stated as follows:

"Indeed, it was appellant's defense that he knew Singer and had been to Singer's home. Based on the information counsel received from appellant, counsel then sought to have the jury view Singer's home, subpoena photographs of Singer's home, or have an investigator photograph or video-tape the interior of the home."

The court concluded that "[t]he information provided by appellant to his counsel concerning appellant's alleged rela-

tionship with Singer and his description of the interior of Singer's home was not confidential; it was intended to be disclosed to third parties."

## II.

We first address petitioner's argument that the Court of Special Appeals erred in holding that the attorney-client privilege does not extend to information provided by a criminal defendant to his defense attorney that would later form the basis of his defense at trial because such information was "intended to be disclosed to a third party?"[8]  We hold that both the *timing* of the communications and the substance of petitioner's communications made by him to his defense counsel were privileged communications.[9]  The prosecutor's questions on cross-examination inextricably linked the two issues and constituted a breach of the attorney-client privilege.

The attorney-client privilege is well established and is understood to be "a rule of evidence that prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice."[10]  *New-*

---

**8.**  Before the Court of Special Appeals, Haley argued that the prosecutor breached the attorney-client privilege during cross-examination and, in doing so, implied to the jury that the defense was manufactured.  The State argued that the trial court was correct in permitting the State's cross-examination because Haley had failed to demonstrate how the cross-examination infringed on the privilege when defense counsel had opened the door by proffering that within the past twenty-four hours he had learned of new information.  The State argued also that the privilege was waived when Haley testified to certain facts that he had communicated with his attorney.

**9.**  The issue of whether petitioner's attorney waived, or could waive, the privilege is not before this Court.  The question is not contained within the certiorari petition and the State did not file a cross-petition for certiorari raising the question of waiver.  *See e.g., Finucan v. Board of Physician Quality Assurance*, 380 Md. 577, 589, 846 A.2d 377, 384 (2004) (holding that petitioner waived constitutional and procedural issues by not raising them in the petition for writ of certiorari, and that, therefore, the Court will not consider the issues).

**10.**  The distinction between facts and communication is critical because the attorney-client privilege protects confidential communications, but

*man v. State,* 384 Md. 285, 302, 863 A.2d 321, 330 (2004) (citations omitted); *see also Harrison v. State,* 276 Md. 122, 131–35, 345 A.2d 830, 836–38 (1975) (describing history of the attorney-client privilege). We have noted as follows:

> "The privilege is an accommodation of competing public interests, the ascendency for compelling policy reasons of the protection from unauthorized disclosure of communications between an attorney and his client over the general testimonial duty and compulsion in the interest of truth and justice. The attorney-client privilege is basic to a relation of trust and confidence that, though not given express constitutional security, is nonetheless essentially interrelated with the specific constitutional guaranties of the individual's right to counsel and immunity from self-incrimination, the oldest of the privileges for confidential communications, going back to the reign of Elizabeth I where it stood unquestioned 'as a natural exception to the then novel right of testimonial compulsion.' "

*Harrison,* 276 Md. at 133–34, 345 A.2d at 837.

We have embraced Professor Wigmore's analysis of the privilege, setting out the elements as follows: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by his legal adviser, (8) except the protection may be waived. *Newman,* 384 Md. at 302, 863 A.2d at 330–31 (quoting *Harrison v. State,* 276 Md. 122, 135, 345 A.2d 830, 838 (1975)); 8 J. WIGMORE, EVIDENCE § 2292 at 554 (McNaughton rev. ed.1961). The privilege is codified at § 9–108 of the

---

not the underlying factual information. 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 503.14[4][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2007) ("Thus, for example, if the privilege has been invoked, a client may not be asked the question: 'What did you tell your attorney about the amount claimed as a business expense?' However, the client may be asked the question: 'Did you spend the amount claimed as a business expense for meals or for travel?' ")

Courts and Judicial Proceedings Article of the Maryland Code, which states "[a] person may not be compelled to testify in violation of the attorney-client privilege."

Although the attorney-client privilege is not given express constitutional protection, nevertheless the privilege is so essential to a relationship of trust and confidence that it is interrelated with the specific constitutional guaranties of the individual's right to counsel. *See Harrison,* 276 Md. at 133, 345 A.2d at 837. We have recognized that the State's interference with the attorney-client relationship may implicate the Sixth Amendment right to effective assistance of counsel, when the defendant is prejudiced. *See Smith v. State,* 394 Md. 184, 205–06, 905 A.2d 315, 327–28 (2006).

In *Harrison,* the defendant testified on direct examination that the witness who identified him had actually recanted his statement in a conversation between Harrison and the witness when they were both housed in the same cell in jail. 276 Md. at 127, 345 A.2d at 834. Following cross-examination by the prosecutor, the trial court asked Harrison whether he had tried to speak further with the witness while in jail. *Id.* at 128–29, 345 A.2d at 834–35. Harrison responded that he couldn't speak with the witness again before trial because they were in different jail sections and that he had told his lawyer "all about it." *Id.* The prosecutor then asked Harrison, "Did you tell your attorney . . . about this case?" and "Did you tell him prior to November, 1970?" *Id.* at 129–30, 345 A.2d at 835. Harrison responded "yes" to both questions. *Id.* The prosecutor called the defendant's former attorney as a witness and elicited testimony that Harrison had never communicated this information to him. *Id.* at 128, 345 A.2d at 834. We held that Harrison did not waive the attorney-client privilege when he replied to the court that "I told my attorney all about it" and that it was error to permit Harrison's former attorney to impeach Harrison's testimony because it violated the privilege. *Id.* at 152–53, 345 A.2d at 847.

We observed also that Harrison did not waive the attorney-client privilege by answering the prosecutor's questions on

cross-examination and noted that there is no legal distinction between " 'the disclosure of [the contents] of a communication' as distinguished from the fact that 'no such communication was ever made between the client and the attorney.' " *Id.* at 152, 345 A.2d at 847. Furthermore, we stated that the subject matter of the prosecutor's questions on cross-examination went to a "conversation" between the appellant and his attorney and "there is authority that the expounding upon cross-examination of questions which inquire into communications between the witness and the attorney constitutes prejudicial error, when properly preserved." *Id.* at 148–49, 345 A.2d at 845.

We disagree with the holding of the Court of Special Appeals that the communications at issue were not privileged. It is well settled that the fact that a defendant testifies on his own behalf does not waive the privilege. *See Rienzo v. Santangelo,* 160 Conn. 391, 279 A.2d 565, 567 (1971) ("The client's offer of his own testimony in the cause at large does not constitute a waiver for the purpose either of cross-examining him as to the communications or of calling the attorney to prove them. If this were otherwise, the privilege of consultation would be exercised only at the penalty of closing the client's own mouth on the stand."); 8 WIGMORE, EVIDENCE § 2327 at 637; 1 MCCORMICK, ON EVIDENCE § 93 at 422 (6th ed.2006). In *Harrison,* we held that defendant's statement that he told his lawyer "all about it" did not waive the privilege. 276 Md. at 152–53, 345 A.2d at 847. Here, where petitioner made no statement during direct testimony that referenced a communication with his attorney and objections were properly made, there is more support to hold that the prosecutor's cross-examination questions invaded the privilege. That petitioner testified to his version of the events, and that he told those facts to his attorney, does not support a conclusion that the communication was not privileged because it was intended to be disclosed to a third party, in this case, the fact finder.

Petitioner's complaint is not solely that he was cross-examined about the facts surrounding his defense; his complaint is also that the State inquired into the *timing* of *when* he disclosed certain information to his attorney. In fact, the two issues are linked based on the prosecutor's phrasing of questions. The intermediate appellate court recognized that the timing of the disclosure falls within the privilege.[11] The court stated as follows:

> "In addition, we also question the State's contention that an inquiry into when a communication was held between a defendant and his attorney does not violate the attorney-client privilege, because it does not seek disclosure of the contents of that communication. In *Harrison*, 276 Md. at 152, 345 A.2d 830, the Court of Appeals declined to draw a distinction between the disclosure of the contents and the fact that no such communication was ever made between the client and the attorney."

Haley's communications to his lawyer, and the timing of when he told the attorney the critical information, fall within the attorney-client privilege. A communication by a client with his or her attorney is presumptively a request for legal advice. *See* 8 WIGMORE, EVIDENCE § 2296 at 567 (stating that a matter committed to an attorney is *prima facie* committed for legal advice and is therefore within the privilege unless it clearly shows otherwise). It doesn't take much to conclude that Haley, who was on trial for several serious offenses, wanted to communicate confidentially with his attorney on the eve of his trial. The prosecutor's questions went to the subject matter and timing of certain communications that Haley had with his attorney and these communications are protected by the privilege. *See Harrison*, 276 Md. at 152–53, 345 A.2d at 847.

The State relies on *Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686 (1999) to support its position that the fact that a

---

**11.** The court ultimately made a conclusion that went off on a different tack, adopting a principle that communications are not privileged if a defendant intends to disclose the contents as a basis for the defense.

communication took place, or the timing of the communication, is not privileged. The Pennsylvania case raised ineffective assistance of counsel, alleging that the defendant was denied effective assistance of counsel because the attorney did not object to the prosecutor's question asking whether he had talked to his lawyer about what he was going to say before he testified. *Id.* at 701. The Pennsylvania Supreme Court, noting first that the case cited by the State did not lend support to the State's argument, stated "we are nevertheless inclined to agree" with the State that the prosecutor did not ask the defendant to disclose the substance of any confidential communication "but instead simply asked if a conversation had taken place." *Id.* at 702. The court went on to find that even assuming *arguendo* the questions implicated the attorney-client privilege, the defendant was not prejudiced. *Id.*

We do not agree with the Pennsylvania Supreme Court, for several reasons. In the instant case, the issue of privilege was preserved, and petitioner was prejudiced. Moreover, the prosecutor's questions in the case *sub judice* inextricably mixed substance with timing. For example, consider the prosecutor's question: "Isn't it true, Mr. Haley, that all this information about the house and everything like that, you never brought up any of that information with your attorney until 4:30 yesterday afternoon?" This question probes both the subject matter and timing of a privileged communication.

■■ The purpose and object of the prosecutor's questions as to the timing of when petitioner told his attorney about his relationship with the victim and the information about the victim's house was to discredit petitioner's testimony and to convince the jury that petitioner's defense was an afterthought or manufactured on the eve of trial. It was not the proper subject of cross-examination and put the credibility of petitioner in issue based on what and when he told his attorney. Petitioner's testimony as to the facts of the event at issue did not constitute a waiver of the attorney-client privilege as to what and when he communicated with his attorney as to the incident. The prosecutor's repeated questions as to when and

what petitioner told his attorney went beyond the scope of proper cross-examination and invaded the attorney-client privilege. Credibility was a central issue in this case; the improper questions were clearly prejudicial.

## III.

The second question raised in this case is: "Where the only description of the suspect involved in a carjacking is a "black female with long hair" wearing a "multi-colored shirt," did the officer in this case have probable cause to arrest the petitioner, a black male with short hair, several hours later based primarily on the fact that he was wearing the same shirt?" We address this issue in the event that there is a new trial. Our review of a motion to suppress is limited to the record of the suppression hearing. *Swift v. State*, 393 Md. 139, 154, 899 A.2d 867, 876 (2006). We review the findings of fact for clear error and do not engage in *de novo* fact-finding. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *Swift*, 393 Md. at 154–55, 899 A.2d at 876. This Court will review *de novo* the question whether, based on the facts presented at the suppression hearing, probable cause existed to support a warrantless arrest. *See Ornelas*, 517 U.S. at 699, 116 S.Ct. at 1663; *Swift*, 393 Md. at 154–55, 899 A.2d at 876. We consider the facts in the light most favorable to the State as the prevailing party and independently apply the law to those facts to determine if the evidence at issue was obtained in violation of the law. *See Laney v. State*, 379 Md. 522, 533–34, 842 A.2d 773, 779–80, *cert. denied*, 543 U.S. 966, 125 S.Ct. 434, 160 L.Ed.2d 335 (2004); *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612, 615 (2001).

The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, protects against unreasonable searches and seizures. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). Under Fourth Amendment jurisprudence, there are often said to be three tiers of interac-

tion between a citizen and the police. *See Swift*, 393 Md. at 149, 899 A.2d at 873. An arrest is the most intrusive encounter. A police officer may arrest a person without a warrant if the officer has probable cause to believe that a felony has been committed or attempted and that such person has committed or attempted to commit a felony whether or not in the officer's presence or view. Md.Code (2002, 2006 Cum.Supp.), § 2–202 of the Criminal Procedure Article; *Swift*, 393 Md. at 150, 899 A.2d at 873. The second level of interaction, known as a *Terry* stop, allows a police officer to forcibly stop a citizen if the officer has reasonable grounds for doing so, *i.e.*, that the officer can point to specific and articulable facts that warrant the stop. *See Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *Swift*, 393 Md. at 150, 899 A.2d at 873. The level of suspicion necessary to constitute reasonable, articulable suspicion is less demanding than that for probable cause. *State v. Nieves*, 383 Md. 573, 589, 861 A.2d 62, 72 (2004). The least intrusive police-citizen contact is a consensual encounter and such an encounter does not implicate the Fourth Amendment because an individual is free to leave at any time during the non-coercive police contact. *Swift*, 393 Md. at 151, 899 A.2d at 874.

In the case *sub judice*, it is clear that Officer Bingham detained Haley and placed him under arrest. To justify this encounter, probable cause is required. Because Haley continued to walk after Officer Bingham's order to stop, Officer Bingham drew his service weapon "approached the suspect, put [him] on the ground and placed [him] in handcuffs." The question in this case is whether Officer Bingham had probable cause to arrest Haley without a warrant.

Probable cause is a nontechnical conception of a reasonable ground for belief of guilt. *State v. Wallace*, 372 Md. 137, 148, 812 A.2d 291, 297 (2002). To determine whether probable cause exists, we consider the totality of the circumstances, in light of the facts found to be credible by the trial judge, factoring in the variables of the information leading to police action, the environment, the police purpose, and the

suspect's conduct. *See Stokes,* 362 Md. at 421 n. 9, 765 A.2d at 619 n. 9. Probable cause exists where the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense. *See Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975); *Wallace,* 372 Md. at 148, 812 A.2d at 297. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. *Wallace,* 372 Md. at 148, 812 A.2d at 298; *see State v. Lemmon,* 318 Md. 365, 379, 568 A.2d 48, 55 (1990) (noting that the determination of probable cause is based on probabilities, not certainties); *see also Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 ("[I]t is clear that 'only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause.'") (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637(1969)).

The trial court denied Haley's motion to suppress. The court stated:

"The salient facts for this Court is that the Police Officer received identification of a car that had been carjacked with a tag number and description of the vehicle. The Police Officer sees that vehicle, sees the driver, makes eye contact, sees the unique article of clothing, pursues that vehicle in a car chase. There is a crash. When the Officer gets to the crash scene, the driver is gone.

"After looking for that driver in the area with support, that individual is not found, but the Police Officer gives a description to workers in the area, receives an anonymous call saying that the person the police are looking for is on Shell Road. The Police Officer goes to that location and sees the person that he saw driving the car, sees that person in the same unique article of clothing and the only Evidence before this Court is that the Police Officer saw the person. He asked the person to stop, that person does not stop.

This Court does not have to find the right to arrest beyond a reasonable doubt, but frankly, if it did, I think this would come pretty close. There is probable cause. The motion is denied."

The Court of Special Appeals affirmed the trial court and concluded that Officer Bingham had probable cause to arrest Haley. The court stated:

"Upon arriving in the area of Shell Road and Chesapeake Avenue, a distance of only five or six blocks from the site of the crash, Officer Bingham observed a pedestrian wearing the unique multi-colored shirt that the Officer had previously observed on the driver of the stolen vehicle. In addition, Officer Bingham testified that the 'general body shape and form, build, matched that of the operator of the vehicle.' The only discrepancy in appearance between the driver and the person near the crash site was with respect to the length of hair; the driver's hair was longer.

"Viewing the facts in the light most favorable to the State, it was reasonable to infer that, after the crash, appellant did not flee the area. Instead, he hid from the police and waited for the police to call off the search. He then began to walk away from the scene, still dressed in the same clothes, and encountered Officer Bingham. We readily conclude that the detention of appellant was supported by probable cause."

Based on the totality of the circumstances, we agree with both the trial court and the Court of Special Appeals that Officer Bingham had probable cause to arrest Haley.

It is uncontested in the present case that Officer Bingham, after receiving a call for an in-progress carjacking and chasing a car that matched the dispatcher's description of a dark four-door with a Maryland license plate number LRN–381, had probable cause to believe a felony had occurred. Md.Code (2002, 2006 Cum.Supp.), § 3–405 of the Criminal Law Article (carjacking is a felony); Md.Code (2002, 2006 Cum.Supp.), § 7–105 of the Criminal Law Article (motor vehicle theft is a

felony). The sole question is whether Officer Bingham had probable cause to believe that Haley was involved in a felony.

Petitioner asserts that Officer Bingham lacked the reasonable articulable suspicion and the probable cause necessary to arrest Haley and relies primarily upon *Stokes v. State*, 362 Md. 407, 765 A.2d 612 (2001) and *Cartnail v. State*, 359 Md. 272, 753 A.2d 519 (2000). These cases do not persuade us that probable cause was lacking in the case *sub judice*. Those cases are readily distinguishable—they involved investigatory stops based on third party descriptions of a suspect. In the instant case, the arrest was based on personal observations of the suspect by the same officer during both the crime *and* the arrest.

Our examination of the events leading up to the arrest and consideration of how a reasonable police officer would view these historical facts lead us to hold that Officer Bingham had probable cause to believe that Haley had committed a felony and, therefore, had probable cause to arrest Haley. We are most persuaded by the fact that Haley was observed *personally* by Officer Bingham during the occurrence of the crime and *then again* when Officer Bingham executed the arrest. Thus, the particularity of the description of the offender was based on first-person observation. Officer Bingham responded at approximately 2:15 a.m. to a call regarding an in-progress carjacking, pursued the vehicle, observed the driver, and noted that the driver's shirt was "multi-colored and just stood out inside the vehicle." Approximately four hours later, in the same general area, Officer Bingham saw a person walking on the road and "there was no doubt in [Officer Bingham's] mind that this individual was the same person operating the vehicle involved in the carjacking." Haley's different lengths of hair at the times when Officer Bingham observed him are inconsequential because Officer Bingham could still recognize Haley's shirt that "matched to a T" that worn by the driver of the vehicle and "the general body shape and form, build, matched that of the operator of the vehicle." Moreover, suspects can easily adopt or remove wigs to change their hair length. *See Collins v. State*, 376 Md. 359, 370, 829 A.2d 992, 998 (2003)

(noting that robbers often shed or change their clothes to foil detection and finding the disparity of clothing match inconsequential). The arrest occurred where it was "highly unusual to see any pedestrians," supporting the inference that there was a low probability of seeing two people with a matching physical appearance and "multi-colored" shirt, even if Haley's hair was shorter than that of the driver's.

Approximately four hours had passed between the crash and when Haley was found within six blocks of the crash site. Because the area had primarily industrial or light personal vehicle traffic and the carjacking suspect initially left the scene by foot, it was reasonable for Officer Bingham to infer that Haley had not moved far from the crash scene. Haley did not stop when Officer Bingham initially ordered him to do so and this action further contributed to Officer Bingham's suspicion that he was involved in the carjacking. We conclude that there are sufficient facts on the record to justify reasonable grounds for belief by Officer Bingham that Haley was associated with the carjacking.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*

Chief Judge BELL joins in all but Part III of this opinion.