959 A.2d 1180

**Richard Lavonte BLANKS**

v.

**STATE of Maryland.**

**No. 13 Sept. Term, 2008.**

**Court of Appeals of Maryland.**

Nov. 12, 2008.

Michael R. Braudes, Assistant Public Defender (Nancy S. Forster, Public Defender, of Baltimore), on brief, for petitioner/cross respondent.

Steven L. Holcomb, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore), on brief, for respondent/cross petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, MURPHY, ADKINS, BARBERA, and JOHN C. ELDRIDGE, (Retired, specially assigned) JJ.

BARBERA, J.

We decide in this case whether the trial court erred by permitting the prosecutor to cross-examine petitioner Richard Lavonte Blanks regarding the timing and content of his communications with defense counsel about his trial testimony. We agree with petitioner that the court erred by permitting the challenged cross-examination. Moreover, we reject the State's contention that the error was harmless beyond a reasonable doubt. We therefore reverse the judgment of conviction and remand for a new trial.

## I.

In May 2006, petitioner was tried before a jury in the Circuit Court for Dorchester County, for the 2004 murder of 22-year-old Tyshika Askins. Petitioner knew Ms. Askins through his girlfriend, Lisa Pinder.[1] The State's theory of the case was that petitioner went to Ms. Askins's apartment sometime during the night of June 6 or early morning hours of June 7, 2004, and killed her during a quarrel about the whereabouts of Ms. Pinder. The State offered considerable evidence in support of that theory. Petitioner, in turn, testified that he was elsewhere when Ms. Askins was killed and had nothing to do with the crime.

Teresa Warner Slacum was Ms. Askins's neighbor. Around 1 p.m. on June 7, 2004, she saw Alonza Dennis, the father of Ms. Askins's baby, in the hallway of the apartment building. He was "hollering, oh no, oh no." Ms. Slacum entered Ms. Askins's apartment and discovered the body of Ms. Askins on the bedroom floor with a pillow over her head.

The police and a forensic investigator responded to the scene. Forensic evidence disclosed that Ms. Askins died about 4:00 a.m. on June 7. The bedroom showed signs of a struggle; an orange juice container, but no drinking glass, was on the kitchen counter; and the cap of the container was on the floor. Latent fingerprints were lifted from the orange juice container.

Danielle Gaines, a longtime friend of Ms. Askins, testified that Ms. Askins was a neat person who would not be inclined to drink orange juice from the container, or let anyone else do so. Ms. Gaines also testified in the State's rebuttal case that she knew Ms. Askins's boyfriend, who is not petitioner. Further, she had no knowledge that Ms. Askins ever had a romantic relationship with petitioner. Ms. Gaines last saw

---

1. Petitioner variously testified that Ms. Pinder is the mother of his children and his "wife or whatever you want to call it." He also testified that he and Ms. Pinder were never legally married. We shall refer to Ms. Pinder as petitioner's girlfriend.

Ms. Askins at the latter's apartment on the evening of June 6, 2004.

The medical examiner who performed the autopsy on Ms. Askins testified that she sustained injuries to her head, neck, and torso, and the cause of death was "strangulation and blunt force injuries." There was evidence that she had fought her aggressor. There was no evidence of recent sexual relations or the consumption of drugs or alcohol.

Police focused their investigation on petitioner once they learned his fingerprints had been left on the orange juice container in Ms. Askins's apartment, and Ms. Pinder was a friend of Ms. Askins. Petitioner agreed to go to the police station to discuss the case. There, Detective Chris Flynn read petitioner his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner agreed to be interviewed. He told the detective he believed Ms. Askins was a friend of Ms. Pinder, and he knew generally where Ms. Askins lived but had never gone to her apartment. He then made a written statement.

Following that, Detective Flynn presented petitioner with a search warrant to obtain buccal skin cell and hair samples, for DNA testing. Petitioner initially refused and demanded to speak with an attorney. Petitioner spoke with an attorney, then agreed to a buccal swab. Petitioner's DNA matched DNA found under Ms. Askins's fingernails and on her T-shirt.

Petitioner's father testified as a State's witness that petitioner came to live with him around the middle of June 2004. He explained that petitioner called him on June 7, 2004, (the day of the murder) and asked to stay with him at his home in New Jersey for awhile, because petitioner was having problems with his girlfriend. According to petitioner's father, petitioner arrived at his home with a car full of clothing on June 14, 2004 and stayed until Labor Day. Petitioner's father denied telling police that petitioner had said he wanted to stay until "things settled down."

Petitioner testified in his defense. He suspected in April 2004 that Ms. Pinder was having an affair. He learned the

identity of her paramour from Ms. Askins, whom he met during the winter of 2003 at a party given by Ms. Pinder. Petitioner testified that he and Ms. Askins began a romantic relationship in April 2004, and they engaged in sexual intercourse at her apartment on several occasions during April and May of 2004.

Petitioner acknowledged that he was with Ms. Askins in her apartment between 9:40 and 10:00 p.m. on June 6, 2004. At that time, they engaged in oral sex but not intercourse, and he touched Ms. Askins's neck, breasts, stomach, and back during the encounter. Afterwards, petitioner asked for a glass of juice. Ms. Askins retrieved the orange juice container from the refrigerator, and he poured himself a glass. Petitioner took the glass with him when he left the apartment because he was in a hurry to see the first game of the NBA finals. He went to a friend's house and stayed there until 7:30 the following morning. Petitioner testified that Ms. Askins left the apartment when he did, and he saw her walk in the direction of her car.

Petitioner denied telephoning his father or driving to his father's home in New Jersey on June 7. He testified that he went to his father's home either on June 14 or June 20 to give Ms. Pinder "some space." He returned home after "five months" because he missed his children and wanted to work things out with Ms. Pinder.

Petitioner acknowledged near the end of his direct examination that he did not reveal in his statement to police that he had been in Ms. Askins's apartment on the evening of June 6. He further acknowledged that he had not told the police about having an affair with Ms. Askins. He explained that he did not want to reveal the affair because he did not want Ms. Pinder to learn about it. Defense counsel then asked: "Had you revealed the affair to anyone at this point?" Petitioner replied: "Just my father." Petitioner concluded his direct testimony by denying that he killed Ms. Askins or had any reason to kill her.

At the outset of cross-examination, the prosecutor, over objection of defense counsel, probed whether and when petitioner had discussed his testimony with defense counsel. The transcript discloses the following exchange between the two, interrupted midway through by a bench conference at which the propriety of the cross-examination was discussed:

[Prosecutor]: You and your attorney have talked about your testimony here previously, right?

[Petitioner]: Only for a brief moment.

[Prosecutor]: Only for a brief moment?

[Petitioner]: That's correct.

[Prosecutor]: Did your attorney go over with you what you were going to testify to?

[Defense Counsel]: Objection, Your Honor.

[The Court]: Overruled.

[Petitioner]: No.

[Prosecutor]: He never went over it with you?

[Petitioner]: No, ma'am.

[Prosecutor]: Never went over what areas he might be asking you questions about?

[Petitioner]: Repeat it again.

[Prosecutor]: Your attorney never went over with you the areas that he was going to question you about, right?

[Petitioner]: No, ma'am.

[Prosecutor]: Never. So you never talked to him about any of these details until today, right?

[Defense Counsel]: Objection, Your Honor.

[The Court]: Overruled.

At that time, defense counsel asked to approach the bench and the following exchange occurred among counsel and the court:

[Defense Counsel]: Your Honor, I think one question generally is appropriate, the more we get into this you're getting into privileged communications.

[The Court]: Well, her second question was a legitimate followup. He says he never talked to you about that so it

would be a logical question to ask was this the first time you ever revealed it to your attorney.

[Defense Counsel]: So I'm going to get to be a witness then to say whether he did or didn't.

[Prosecutor]: You're the one who put him on the stand.

[Defense Counsel]: Do I get to be called as a witness?

[Prosecutor]: Now you're going to impeach your own client with your own testimony.

[Defense Counsel]: No, but the further we go down the road, Your Honor, the more likely—

[The Court]: You're not planning on going much—

[Prosecutor]: This is all I want to know.

[Defense Counsel]: More than likely I'm going to be a witness.

[Prosecutor]: I really don't think so.

[The Court]: Step back.

Cross-examination resumed with the following:

[Prosecutor]: Okay. Let me ask you again. So basically today is the first time that you've gone into detail or said much about—

[Defense Counsel]: Objection, Your Honor.

[The Court]: It's noted and overruled.

[Prosecutor]:—what you've testified to today, right?

[Petitioner]: You mean have I went into detail with my attorney?

[Prosecutor]: Yes. You just said you only talked to him briefly so today would be the first time you've really gone into detail about what happened, right?

[Petitioner]: We talked about the case.

[Prosecutor]: The question was you said you'd only talked to him briefly about what you just said here today?

[Petitioner]: You said did we went (sic) over the testimony, we only went over it briefly last night, like ten minutes.

[Prosecutor]: Okay. So this would be the first time you've really given him the full story was here today; is that right?

[Defense Counsel]: Objection, Your Honor.

[The Court]: I sustain that.

With that, the prosecutor turned to other lines of cross-examination, including why petitioner had told the police that he did not know where Ms. Askins lived. Petitioner responded that he believed the police were lying to him, so he decided to lie to them.

The jury convicted petitioner of first-degree murder and first-degree assault. At sentencing, the court merged the assault conviction into the murder conviction and imposed a life sentence.

Petitioner noted an appeal to the Court of Special Appeals, and raised a number of claims of error. Only two of those claims concern us here: (1) whether the trial court erred in permitting the State to inquire about privileged communications between petitioner and his counsel; and (2) whether the trial court erred in admitting the testimony of the interrogating detective that petitioner had invoked his rights to counsel and to remain silent.

With regard to the first claim of error, a panel of the intermediate appellate court concluded that the prosecutor's questions concerning petitioner's communications with his attorney did not invade the attorney-client privilege and, even if they did, the cross-examination was at worst harmless error. The panel compared the cross-examination in the present case with the cross-examination of the defendant in *Haley v. State*, 398 Md. 106, 919 A.2d 1200 (2007), in which we held that the cross-examination invaded the attorney-client privilege. The panel evidently treated as preserved for appellate review only the questions to which defense counsel promptly objected. The panel concluded that those questions "simply do not rise to the level of those in *Haley*." The panel further observed that, "unlike in *Haley*, the credibility of the witnesses was not the 'central issue' in the case." The panel decided that, "[e]ven if we were to assume *arguendo* that the preserved questions improperly implicated the attorney-client privilege,

we would fail to find prejudice; thus, any error would be harmless." (Internal citation omitted.)

As for the second claim—that the trial court erred by allowing the detective to testify that petitioner invoked his right to counsel and to silence—the panel held that petitioner had "waived his objection by testifying as to the subject matter without objection, and any error in the initial admission [of the evidence] was rendered harmless." The panel affirmed the judgment in an unreported opinion.

Petitioner filed both a *pro se* petition for writ of certiorari and a petition prepared by counsel. The latter petition presented two questions:

I. Did the Court of Special Appeals err in finding no error where the prosecutor was permitted, in the presence of the jury, to question the accused concerning the content and timing of his communications with his attorney?

II. Did the Court of Special Appeals err in finding no error in the admission of evidence that Petitioner had invoked his rights to counsel and to remain silent?

The State filed a conditional cross-petition asking:

Did [petitioner] waive his claim concerning cross-examination as to communications with his attorney by not objecting to each question at trial?

We denied the *pro se* petition and issued a writ of certiorari to address the above three questions. *Blanks v. State,* 404 Md. 658, 948 A.2d 70 (2008). We shall hold that the first of petitioner's two questions is preserved for our review, and the trial court committed reversible error in permitting the prosecutor to intrude upon matters protected by the attorney-client privilege. Because petitioner is entitled to a new trial as the result of that holding, we do not address the second question he presents.

## II.

We first address the State's assertion that petitioner has not preserved his challenge to the prosecutor's cross-

examination about the timing and content of his communications with his attorney. The State's argument has two prongs: first, petitioner put the issue in play by explaining on direct examination why he told "just his father" that he had an affair with the murder victim and did not reveal the affair to the police; and, second, petitioner did not object when the prosecutor began to question him concerning when and what he had discussed with counsel. Neither prong of the State's argument has merit.

 First, petitioner did not open the subject of privileged communications simply by testifying on direct examination that he told "just his father," and not the police, about the affair with Ms. Askins. Second, defense counsel, though not objecting to the prosecutor's first question concerning whether petitioner had talked with his counsel before trial, did object to the next question, "Did your attorney go over with you what you were going to testify to?" The court overruled that objection, and the prosecutor twice repeated what was, essentially, the same question, without objection from counsel. Upon twice receiving the same answer from petitioner, the prosecutor asked: "So you never talked to him about any of these details until today, right?" Defense counsel promptly objected to that question, and the bench conference followed.

At the bench, defense counsel made quite clear to the court his belief that the cross-examination breached the attorney-client privilege and was therefore objectionable. The court permitted the examination to resume, evidently assured by the prosecutor that the questioning would not go much further. The prosecutor resumed her questioning by asking: "Okay. Let me ask you again. So basically today is the first time that you've gone into detail or said much about—." Counsel again objected, and the court responded: "It's noted and overruled." Several other questions of the same ilk followed, without objection, until the prosecutor asked: "Okay. So this would be the first time you've really given him the full story was here today; is that right?" Defense counsel again objected, and the court sustained the objection, ending the inquiry.

■ The purpose of Maryland's preservation rule, Maryland Rule 8–131(a), is " '(a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and (b) to prevent the trial of cases in a piecemeal fashion.' " *Robinson v. State,* 404 Md. 208, 216–17, 946 A.2d 456, 461 (2008) (quoting *Fitzgerald v. State,* 384 Md. 484, 505, 864 A.2d 1006, 1018 (2004)). Petitioner satisfied that purpose. He objected to the first question that approached the timing and content of petitioner's communications with counsel, explained at the bench his concern that the questions invaded the attorney-client privilege, and re-objected when the court permitted the inquiry to resume. Under those circumstances, no further objection was necessary. *See Johnson v. State,* 325 Md. 511, 514–15, 601 A.2d 1093, 1094 (1992) (finding the merits of a claim preserved for review on the basis of a single objection to the line of inquiry because counsel's "objection went not only to what was said but also to what was obviously to come," and the court, by overruling the objection, demonstrated that he was permitting the prosecutor to continue along the same line).

The merits of petitioner's claim are preserved for our consideration. We shall examine the claim by considering the entirety of the State's inquiry into petitioner's communications with his attorney.

### III.

■ The attorney-client privilege is " 'the oldest of the privileges for confidential communications known to the common law.' " *Newman v. State,* 384 Md. 285, 300–01, 863 A.2d 321, 330 (2004) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981)); *see also Harrison v. State,* 276 Md. 122, 131–35, 345 A.2d 830, 836–38 (1975) (discussing the development of the rule from its inception in England during the reign of Elizabeth I (1558–1603)). The privilege "is a rule of evidence that forever bars disclosure, without the consent of the client, of all communications that pass in confidence between the client and his

attorney during the course of professional employment or as an incident of professional intercourse between them." *State v. Pratt,* 284 Md. 516, 519–20, 398 A.2d 421, 423 (1979). The privilege has been codified in Maryland law. *See* Md.Code (1973, 2006 Repl.Vol.), § 9–108 of the Courts and Judicial Proceedings Article (providing that "[a] person may not be compelled to testify in violation of the attorney-client privilege").

■■■ The privilege protects "confidential communications, but not the underlying factual information." *See Haley,* 398 Md. at 125 n. 10, 919 A.2d at 1211 n. 10. The privilege is recognized as " 'an accommodation of competing public interests' " favoring " 'protection from unauthorized disclosure of communications between an attorney and his client over the general testimonial duty and compulsion in the interest of truth and justice.' " *Id.* at 126, 919 A.2d at 1211 (quoting *Harrison,* 276 Md. at 133, 345 A.2d at 837). The privilege, " 'basic to a relation of trust and confidence,' " is not itself grounded in the Constitution; nevertheless, it is " 'essentially interrelated with the specific constitutional guaranties of the individual's right to counsel and immunity from self-incrimination.' " *Id.; see also Smith v. State,* 394 Md. 184, 210, 905 A.2d 315, 330 (2006) (concluding that an attorney's violation of the attorney-client privilege "established a violation of [the client's] right to effective representation under the Sixth Amendment" standard for determining effective assistance of counsel).

■■ The privilege protects, not merely the contents of communications between a client and counsel, but the fact that communications did or did not take place. *Harrison,* 276 Md. at 152, 345 A.2d at 847. The privilege also protects the timing of such communications. *Haley,* 398 Md. at 125, 919 A.2d at 1210–11.

■■■ The privilege is held by the client and in certain circumstances it can be waived. *See Smith,* 394 Md. at 205–06, 905 A.2d at 327–28; *see, e.g., State v. Fair,* 354 N.C. 131, 557 S.E.2d 500, 525–26 (2001); *State v. Baker,* 302 Mont. 408,

15 P.3d 379, 383 (2000). It is settled, however, that a defendant's testifying on his or her own behalf does not waive the privilege, *Haley*, 398 Md. at 128, 919 A.2d at 1212, and a defendant's merely answering a question on cross-examination that he told his lawyer "all about it" does not waive the privilege. *Harrison*, 276 Md. at 147–148, 345 A.2d at 844–845. Petitioner's unobjected-to response to the prosecutor's first question on the subject of communications with counsel did not amount to a substantive waiver of the privilege, and the State does not seriously contend otherwise.

We recently analyzed the rule on attorney-client privilege and its application in *Haley*. Haley was charged with carjacking one Leroy Singer. Mr. Singer testified that he had never met Haley before the incident and identified Haley as the person who had put a knife to his throat and taken his car. 398 Md. at 114–16, 919 A.2d at 1204–06. Haley, in turn, testified that he and Mr. Singer had an ongoing relationship, and Mr. Singer had given him permission to drive his car. Haley sought to establish the existence of that relationship by describing in his direct testimony the outside of Mr. Singer's house, items inside the house, and the appearance of his dog. To support that testimony, defense counsel asked the court to allow the jury to view either the interior of Mr. Singer's home or pictures or a videotape of its interior. Counsel explained to the court that he did not make the request sooner because he had just received information from Haley the night before and acted on the information as quickly as possible. *Id.* at 117–120, 919 A.2d at 1206–07.

The prosecutor sought to exploit counsel's disclosure of the recent communication between Haley and defense counsel. Over defense objection, the court permitted the prosecutor to cross-examine Haley about whether and when he discussed with defense counsel his testimony concerning knowledge of Singer's house. *Id.* at 122–24, 919 A.2d at 1209–11. We considered Haley's challenge to the cross-examination against the backdrop of *Harrison*, 276 Md. 122, 345 A.2d 830, and other authorities. 398 Md. at 127–28, 919 A.2d at 1212. We held that "[t]he prosecutor's repeated questions as to when

and what petitioner told his attorney went beyond the scope of proper cross-examination and invaded the attorney-client privilege." *Id.* at 130–31, 919 A.2d at 1214.

Haley is in material respect identical to the present case and controls our disposition of it. In this case, as in Haley, the prosecutor sought to expose when and what petitioner had discussed with his attorney about his relationship with the murder victim, Ms. Askins. As in Haley, the prosecutor invaded the attorney-client privilege by posing those questions, regardless of the answers petitioner gave. The court therefore erred in permitting the questioning.

The State mounts no argument that the cross-examination did not invade the attorney client privilege. The State argues instead that reversal is not warranted because "the questions [at issue in the present case] were not as direct and prejudicial as those at issue in *Haley.*" We agree that the questions in the present case were not as pointed as those in *Haley;* nevertheless, the questions invaded petitioner's attorney-client privilege. Moreover, insofar as the State suggests that prejudice to the petitioner is a component of the privilege analysis, the State is incorrect. We suspect that the error stems from a misreading of *Haley.*

Our discussion of prejudice in *Haley* cannot be taken out of context. That discussion followed our conclusion that Haley's attorney-client privilege was invaded by the prosecutor's questioning. 398 Md. at 128, 919 A.2d at 1212–13. The discussion arose as we explained why the State's reliance upon the Pennsylvania Supreme Court's decision in *Commonwealth v. Carson,* 559 Pa. 460, 741 A.2d 686 (1999), was unavailing.

Carson involved the defendant's allegation that he was denied effective assistance of trial counsel because counsel did not object when the prosecutor cross-examined him about his pre-trial communications with counsel. 398 Md. at 130, 919 A.2d at 1213. The Pennsylvania Supreme Court was inclined to believe that the defendant's attorney-client privilege was not violated because the prosecutor had not probed the substance of the communications with counsel. That court none-

theless concluded that the defendant was not prejudiced by disclosure of the communications and, consequently, was unable to establish that counsel was ineffective by not objecting to the cross-examination. *Id.*

We stated our disagreement in *Haley* with the *Carson* court's inclination that the attorney-client privilege protects only the content, and not necessarily the timing, of a communication with counsel. We also noted that, unlike in *Carson*, Haley's defense counsel had objected to the prosecutor's questioning. And we noted that Haley, unlike the defendant Carson, was prejudiced by the prosecutor's invasion of the privilege. In that regard, we noted that credibility was "a central issue" in Haley's case and the prosecutor's questioning on the timing of Haley's disclosure to his counsel undermined his credibility. *Id.* at 130–31, 919 A.2d 1200, 919 A.2d at 1214. What cannot be overlooked is that the "prejudice" the *Carson* court was addressing, and to which we responded in *Haley*, related to the prejudice that any defendant must establish in order to prevail upon a claim of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 697 (1984). By no means did we hold in *Haley* that a defendant must establish both error and prejudice when challenging on direct appeal a trial court's allowing cross-examination that invades the attorney-client privilege.

*Haley*, then, should not be read as dictating that whether a defendant's attorney-client privilege has been violated turns on the extent to which the violation causes prejudice to the defendant at his trial. Rather, the error rests in the violation of the privilege itself. The defendant does not have the burden to establish that the error influenced the verdict; rather, the State, as the "beneficiary of such error," must "demonstrate, beyond a reasonable doubt, that the error did not contribute to the verdict—and is thus truly 'harmless'[.]" *Dorsey v. State*, 276 Md. 638, 658, 350 A.2d 665, 677 (1976).

## IV.

The State argues that any error attendant to the violation of petitioner's privilege is harmless. The standard for harmless error we announced in *Dorsey*, and have followed ever since, states:

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

276 Md. at 659, 350 A.2d at 678; *see, e.g., Lee v. State*, 405 Md. 148, 164, 950 A.2d 125, 134 (2008) (applying the *Dorsey* standard).

The State has not carried its burden of demonstrating that the error was harmless beyond a reasonable doubt. Certainly, the State presented a strong case against petitioner, including in particular the DNA and fingerprint evidence. Moreover, the State offered evidence countering petitioner's testimony that he and Ms. Askins had been involved in an affair. The strength of the State's case, however, made it all the more important to the defense that the jury believe petitioner's testimony.

Petitioner's defense was that the father of Ms. Askins's child had committed the murder. To support that defense and explain the forensic evidence against him, petitioner testified about the affair with Ms. Askins. That testimony provided a reason for his being at the victim's apartment hours before her murder, and for the presence of his DNA on her body and his fingerprints on the orange juice container. Key to the success of that defense was the credibility of petitioner's testimony about the affair itself, as well as his testimony concerning why he told only his father of the affair and did not reveal it, or his connection to the victim's apartment, to the police.

The prosecutor's cross-examination implied that petitioner had not revealed this crucial information to his lawyer, and it

had the obvious purpose of undermining petitioner's credibility. In the words of petitioner, "the entire thrust of the cross-examination was that petitioner's testimony should be disbelieved because if it had been true, it would have been disclosed to counsel." The prosecutor then exploited the seeming lack of credibility of petitioner's defense by attacking it as the "I'm her lover defense," disbelieved even by his lawyer.[2]

The State has every right to challenge a criminal defendant's credibility through vigorous cross-examination. The State has no right, however, to effect that goal through improper means. In this case, the State undermined petitioner's credibility by the improper means of invading his attorney-client privilege. The court's error in allowing such cross-examination was not harmless. Consequently, petitioner is entitled to a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED WITH DIRECTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL.**

**COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY DORCHESTER COUNTY.**

MURPHY, J., Concurs.

MURPHY, J.

I agree that the prosecutor should have been prohibited from asking the petitioner *when* he had discussed his testimony with his trial counsel. I write separately, however, to offer a suggestion that would reduce the chances that a conviction will be reversed on the ground that the prosecutor's cross-

---

2. The prosecutor's comment in rebuttal argument that defense counsel "barely skimmed over his own client's silly testimony, because clearly he didn't buy that mess either up on the stand," was struck by the court and the jury was instructed to disregard it.

examination of the defendant violated the attorney-client privilege.

In *Forbes v. State,* 175 Md.App. 630, 931 A.2d 528 (2007), the Court of Special Appeals held that "the prosecutor should not have been permitted to ask appellant, in effect, whether, during a confidential communication with his lawyer, appellant (1) confessed that he had committed the robbery, and (2) asked his lawyer to call a defense witness who was prepared to present false testimony." 175 Md.App. at 636, 931 A.2d at 532. Recognizing that the attorney-client privilege does not operate to exclude everything the criminal defendant says to his or her lawyer, the *Forbes* Court stated:

> We therefore hold that *Harrison [v. State,* 276 Md. 122, 345 A.2d 830 (1975)] prohibits the prosecutor from cross-examining the defendant about anything that the defendant did—or did not—say to his or her lawyer, unless and until (1) the prosecutor has expressly requested the trial judge's permission to do so, and (2) after inquiring into "all the surrounding facts and circumstances," the trial judge has expressly identified "the permissible and the prohibited areas of inquiry." We also hold that, in a jury trial, both the request and inquiry must take place out of the presence of the jury.

175 Md.App. at 639, 931 A.2d at 534.

I would require that this procedure be followed in every criminal case.