14 A.3d 639

Omar Nathan McLENNAN

v.

STATE of Maryland.

No. 16, Sept. Term, 2009.

Court of Appeals of Maryland.

March 4, 2011.

Argued by Michael Braudes, Asst. Public Defender (Nancy S. Forster, Public Defender, and Sherrie B. Glasser, Asst. Public Defender, Baltimore, MD), on brief, for petitioner.

James E. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Howard County, a jury convicted Omar Nathan McLennan, Petitioner, of armed robbery. Although he concedes that the State's evidence was sufficient to establish that he committed that crime on November 29, 2005, Petitioner argues that he is entitled to a new trial on the ground that (in the words of his brief), "the trial court's ruling, excluding the testimony of Mr. [Gordon] Smith and Mr. [Douzoua] Nado, deprived Petitioner of a fair trial." After the

Court of Special Appeals affirmed the conviction in an unreported opinion, Petitioner filed a petition for writ of certiorari in which he presented this Court with a single question:

Did the trial court err in refusing to allow defense witnesses to testify on Petitioner's behalf?

We granted that petition. 407 Md. 529, 967 A.2d 182 (2009). For the reasons that follow, we hold that the Circuit Court (1) was not clearly erroneous in finding that Mr. Smith and Mr. Nado were "alibi" witnesses, and (2) did not abuse its discretion to exclude their testimony on the ground that the defense had failed to comply with the requirements of Md. Rule 4–263(d)(3).[1] We shall therefore affirm the judgment of the Court of Special Appeals.

## Background

The opinion of the Court of Special Appeals includes the following background information:

On November 29, 2005, at some time after 9:00 P.M., [the victim], a "pizza driver" for Waterloo Pizza and Subs, was robbed at gunpoint by two men. Taken from him was approximately $250, a pizza, and a paper bag containing chicken tenders.

\* \* \*

As soon as [Officer Thomas Townsend] received the report of the robbery, he responded immediately. As he approached the area of the crime he observed a pick-up truck meeting the description furnished by [the victim]. He activated his emergency equipment and followed the pick-up truck for about two thirds of a mile.

\* \* \*

When Officer Townsend ultimately stopped the pick-up truck, he placed [Petitioner] and Pedro Mendez in handcuffs

---

1. As a result of amendments to Md. Rule 4–263 that took effect on July 1, 2010, the defendant's obligation to provide the State with the names and addresses of "alibi witnesses" is set forth in Md. Rule 4–263(e)(4).

and seated them on the grass to await the arrival of [the victim].

The third key State's witness was Pedro Mendez, who ... testified that on November 29, 2005 at about 9:00 P.M. he was driving his pick-up truck on the street when he saw [Petitioner] and [Petitioner's] friend Darnell Mann, both of whom he knew, beckoning him to stop. They asked him for a ride. When he agreed, they asked him to wait several minutes. When a short time later they entered the pick-up truck, Darnell was holding a pizza box. Both passengers said, "Come on, let's go." As Mendez then drove down the street, he saw police lights behind him. As he started to slow down, Darnell jumped out [of] the truck with the pizza box. When the pick-up truck was finally pulled over, he and the appellant were placed under arrest.... The State's evidence showed that [Petitioner] was in that pick-up truck continuously from the time it left the robbery scene until it was stopped by the police a few minutes later and a short distance away

\* \* \*

[Petitioner] testified that on November 29, 2005, his mother dropped him off on Overheart Lane, near the crime scene, at about 9:30 P.M. so that he could visit a friend, Bradley Thomas. Because Bradley Thomas's parents did not allow him to have friends over, [Petitioner] left the house. He then ran into a friend, Robert Jones, and asked him for a ride home. When Jones was unable to help him, [Petitioner] proceeded to the Quiet Hours apartment complex and knocked on the door of a friend, Michael McGill. When no one answered the door, [Petitioner] walked back toward Overheart Lane. At that point a pick-up truck pulled over to where [Petitioner] was standing. He recognized the driver as Pedro Mendez and asked him for a ride. Mendez replied, "That's cool," and [Petitioner] entered the rear seat. The front seat was occupied by Ashley Davis, a woman whom [Petitioner] knew.

A short time later a police cruiser began to follow them and activated its emergency lights. When Mendez slowed

the pick-up truck down, Ashley Davis, who was wearing a black and red "hoodie," jumped out and fled the vehicle. [Petitioner] stated that Darnell Mann was not in the pick-up truck at any time of which he was aware. A short distance further on, Mendez stopped the vehicle and he and [Petitioner] were arrested. Under [Petitioner's] version of the events, the pick-up truck's presence at the scene of the robbery would have to have been at a time prior to when [Petitioner] asked for a ride and got into the vehicle.

Robert Jones testified and corroborated at least part of [Petitioner's] alibi. He testified that at approximately 9:45 to 10:00 P.M. on November 29, 2005, he saw [Petitioner] come out of a house on Overheart Lane. [Petitioner] asked whether Jones could give him a ride home but Jones replied that he did not have a car. They spoke for about ten minutes and [Petitioner] then left Jones's presence. Seth Burgess, a friend of [Petitioner], also testified for him. He said that "around nine or ten" that night he saw [Petitioner] approach Pedro Mendez and ask for a ride. [Petitioner] entered the vehicle calmly and quietly and the witness did not see Darnell Mann in the vehicle.

*McClennan v. State,* No. 1172, Sept. Term, 2007, slip opinion pp. 1–6 (filed Nov. 24, 2008).

Petitioner's first trial ended with a hung jury. After a series of postponements, the trial that resulted in Petitioner's conviction commenced on April 23, 2007, which is the date on which Petitioner's trial counsel identified Mr. Smith and Mr. Nado as additional defense witnesses.

Jury selection was completed on the morning of April 23, 2007. Prior to opening statements, Petitioner's trial counsel argued that the Circuit Court should permit the defense to call Mr. Smith and Mr. Nado even though those two potential witnesses had not been identified before that date. That argument resulted in a colloquy that occupies thirty two pages of the trial transcript, the relevant portions of which are as follows:

[PETITIONER'S COUNSEL]: .... I don't believe that any of them are really alibi witnesses and this is why. I mean, I think the State's theory is that this robbery occurred somewhere around nine-forty-five. These witnesses who I will be calling, none of them are going to be saying, oh, at exactly that time, during that two or three-minute period when this robbery occurred, we were with Omar McLennan.

What they are all going to say is we saw Omar McLennan during the events of that evening. You know, one of them spoke to him for a little while at this time, one of them spoke to him for a little while at that time, okay. I don't, based on what they have said to me, anticipate any of them saying that they were with him, that he was with them at the precise time of this robbery. So I don't see any of them as alibi witnesses.

THE COURT: Well, if they are not alibi witnesses then what relevance do they have?

[PETITIONER'S COUNSEL]: They have relevance because they were with him shortly before the robbery when he was engaging in activity that is consistent with his version of what he was doing that night, and that is hanging around Owen Brown and, at some point, looking for a ride home.

I mean, what he was doing in the minutes before the robbery, I certainly think is relevant.

\*     \*     \*

THE COURT: All right, this is what I require of you. I'm going to ask you to give me a specific proffer of what each of these witnesses would say, because I can't just assume, for the sake of argument, that they are not alibi witnesses. From what I hear, they sound like alibi witnesses and if I determine that they are alibi witnesses, then we need to go to the issue of whether or not they are going to be prohibited from testifying.

[PETITIONER'S COUNSEL]: Two of them will say that they saw Mr. McLennan and that Mr. McLennan was in the

area, certainly in close proximity to where the robbery took place, and that he asked one of the two of them for a ride. That one, that's Gordon Smith, agreed to give him a ride but said he couldn't give him a ride at that moment, that he had to do something else first.

I would say Gordon—I believe Gordon Smith would testify that that conversation occurred around nine-thirty, maybe nine-thirty-five.

THE COURT: All right. Who is the other witness?

[PETITIONER'S COUNSEL]: Douzoua Nad[o] would testify that he was present when Mr. McLennan asked Mr. Smith for the ride and he saw all of this. So he was just a witness to those same events.

THE COURT: All right.

[PETITIONER'S COUNSEL]: He then goes in the house; he doesn't see anything more. Mr. Smith then comes back, after he does whatever it is that he has to do, and when he gets back, Mr. McLennan is gone. So he doesn't know, firsthand, what happened.

THE COURT: When does he get back?

[PETITIONER'S COUNSEL]: He drives back.

THE COURT: What time?

[PETITIONER'S COUNSEL]: Oh, he says he's gone no more than ten minutes, so nine-forty-five.

\*　　\*　　\*

THE COURT: ... [W]hen was the first time that you advised the State of ... Mr. Nado, and Gordon Smith?

[PETITIONER'S COUNSEL]: Today, Your Honor. Today is the first day I had ever even heard the names Gordon Smith and Mr. Nado.

THE COURT: Now, who was it that provided you with those names?

[PETITIONER'S COUNSEL]: Mr. McLennan's mother approached me and said that, coincidentally, Mr. Smith has a case scheduled today and that as they got to talking about that night, the night of the incident, that Mr. Smith recalled

being present that night and assumed that this case had been long over with. He knew because he remembered the incident where Mr. McLennan got arrested and so he then told her, she then told me.

In the course of speaking to Mr. Smith, he then advised that there was this other individual, Mr. Nado, who also was out there that night and they were going to try to contact him and see if he would be willing to come in and they did and he did come in.

THE COURT: And this is the first time, in your preparation of the case and your discussion with prior counsel and your review of records and review of the transcript, and I'm not asking for work product or attorney-client—or matters covered by the privilege, but this is the first time that you heard that a person by the name of Gregory Smith asked your client or your client asked him for a ride on that night?

[PETITIONER'S COUNSEL]: Gordon Smith, yes, Your Honor. Yes, Your Honor. That was never mentioned to me by Mr. McLennan; that was never mentioned to me by his mother. I have spoken to Stephen Friedman on a couple occasions regarding this case, he never mentioned it to me.

THE COURT: Just out of the blue, this Mr. Smith ran into your client's mother today in the courthouse and reminded her of something that even your client didn't recall?

[PETITIONER'S COUNSEL]: Well, I'm not going to say that he didn't recall it. He didn't mention it, yes.

Now I'm sure that all of the things that your are pointing our are things that the State is going to certainly argue and, you know, I don't think that I should be precluded from calling these witnesses just because maybe it seems, on the surface, like their testimony will be lacking in credibility based on the reasons that the Court has suggested.

THE COURT: Well, it seems to me, particularly when we are talking about Smith and Nado, that the only value that they have is to show that your client was at a time, at a

place, and circumstances that make it unlikely that he was involved in a robbery that happened ten minutes later.

[PETITIONER'S COUNSEL]: Exactly, that's correct.

THE COURT: And that kind of sounds like alibi to me. How is that not alibi evidence?

[PETITIONER'S COUNSEL]: Well, I mean, I guess if— let me think here. I'm trying to think of an analogy, Your Honor. You know, if there is evidence that a savage murder took place at, you know, ten o'clock, and, you know, in a certain location, and there is evidence that [Petitioner] in that case was present near that location fifteen minutes before the savage murder took place, and I can call witnesses who will testify, yes, I saw him and his demeanor seemed perfectly normal, I spoke with him, nothing seemed unusual about him, he didn't seem upset about anything, I think that would be relevant testimony and I don't think it would be alibi evidence because certainly physically it would have been possible for the person to go commit that crime, but I still think that the fact that the person's demeanor was, as I've just mentioned, would be relevant and something the Defense could present to show it is less likely that he committed this crime than it is that he did commit the crime. Less likely that he did commit it than that he didn't, I mean.

THE COURT: But if the added part of that was that the timing of the observation was such that it is unlikely that the person was physically involved in it—you see, what your proffer, what your argument is going to be, if it is consistent with your proffer, is, ladies and gentlemen, my client couldn't have been involved in this because a mere ten minutes before the robbery he was seen talking to Gordon Smith and he was talking about getting a ride. He wasn't talking about planning a robbery, he wasn't talking about, I don't know, getting a mask or whatever it is. He was talking about getting a ride. And how likely is it that the Defendant could have talked to Mr. Smith gotten hooked up with Mr. Mendez and committed this robbery? It is not

likely because we are talking about a ten-minute window here.

That is the inescapable argument that I have heard so far and I think that is a little bit different than arguing demeanors in your hypothetical.

\*     \*     \*

THE COURT: [W]e have a situation where [Petitioner] was arrested and charged with this quite some time ago. Initial counsel, Mr. Friedman, entered his appearance at the end of January 2006. The State's first letter and demand for discovery under Maryland Rule 4–263 was sent on February 1, 2006, at which point in time included in there was a specific demand for alibi witness information.

Then this matter proceeded to trial on May 3, 2006. There was a hung jury on that date. There was no alibi defense presented at that trial, as far as I know. These witnesses were not presented at that trial. There was a re-trial date set for June 26, 2006, that was postponed at the request of the State. On September 21, 2006, the Court signed an order striking the appearance of private counsel because, apparently, the financial arrangements had broken down between counsel and client.

The October 4, 2006 trial date that had been set in June was postponed by [Petitioner] because he was without counsel. The November 9, 2006 trial date was postponed by [Petitioner] because he was without counsel. The February 13, 2007 trial date was postponed by [Petitioner] because he had counsel but had just gotten the Office of the Public Defender.

[Petitioner's counsel] was identified as a panel attorney at some point on or about February 21, 2007. I saw that because in another request for postponement filed by [Petitioner], there was a request by Mr. Willemin of the Public Defender's Office—there was a request to move the scheduled trial date of April 16, 2007 to April 23, 2007.

Now, so [Petitioner's counsel], by his representations earlier, has had the case at least the last forty-five days and now, today—and this isn't directed at [Petitioner's Counsel]

individually—now, today, the Defense produces the names of [Mr. Smith, Mr. Nado, Mr. Seth Burgess, and Mr. Bradley Thomas]. They have no use if they are not alibi witnesses. Telling where he is or what he is doing is not relevant in this setting as I have understood the proffers, except to say look at where he was, look at what he was doing at such and such a time, he couldn't have moved himself to another point, gotten himself with people, and committed a robbery in that limited time.

That is the only use for it. I think it is an alibi. The proffer, in my opinion, is that of an alibi witness. Things haven't changed. I mean, Mr. Smith had this conversation with [Petitioner] back on November 29, 2005 and the fact that [Petitioner] didn't bring it up is—well, I'm not going to comment on that, but for Mr. Smith to randomly run into [Petitioner]'s mother in the hallway and advise her of that which, you know, [Petitioner] was part of, I find that it is unlikely.

Now, the violation here in terms of not disclosing this is a substantial violation. Things haven't changed since November 25, 2005 in terms of who Mr. McLennan was interacting with. For this to be brought to Counsel's attention on the day of, in my mind, constitutes something more than a mere technical violation. The reason for the violation is that the witness had to remind [Petitioner]'s mother of his involvement rather than [Petitioner] and I find that difficult to accept.

Obviously, both sides are prejudiced by either excluding or not excluding an alibi witness. If both sides weren't prejudiced by it, there would be an agreement. But given the nature of an alibi defense, it is the State that suffers significant prejudice in that they don't know who these people are. They haven't had an opportunity to investigate them. They clearly—Mr. Smith is involved or at least—I don't want to say clearly, there is some indication that Mr. Smith has some type of criminal background or else he wouldn't have been here in the courthouse.

Maybe he was here in support of friends. Maybe he was here pursuant to a civil matter, I don't know. But I find

that there is a significant prejudice to the State. Not to say that there isn't a prejudice to [Petitioner]; however, there is significant prejudice to the State.

Can it be resolved by a postponement? I don't know. The reason I don't know that is by virtue of the difficulties that the Defense had in trying to serve Mr. Thomas. There hasn't been any representation about the availability of Mr. Smith and Mr. Nado, however, is a postponement an appropriate thing at this time? Once again, by my count, this case has been postponed, since the initial trial, one, two, three, four times at the request of the Defense, once at the request of the State. This is information that relates to an alleged alibi that should have been available back in 2006 to Mr. Friedman, had there been an alibi.

For it to spontaneously appear in the courthouse on the morning of trial, I find difficult to accept and I'm going to grant the State's request to preclude from testifying Gordon Smith ... Douzoua Nado, and Bradley Thomas. I will deny the State's request with respect to Mr. Burgess.

The Circuit Court reconsidered its ruling with respect to Mr. Thomas on the ground that, during Petitioner's first trial, Mr. Thomas had been identified as a potential defense witness. The Circuit Court did not, however, permit the defense to call Mr. Smith or Mr. Nado. The following transpired on April 24, 2007, when Petitioner's trial counsel again requested permission to call those two witnesses:

THE COURT: . . . . But as I understand the proffer, the value of these witnesses is to support the argument that Mr. McLennan could not have been involved in this robbery as a participant, as an active participant, because one would expect that the people who were going to commit the robbery would be planning and organizing in that they had called for a pizza delivery to be, you know, a delivery man to come to that spot and that they would make the decision to lie in wait for that person. So everybody would be together planning and the fact that he wasn't with the other two fellows planning suggests, you know, that he is not involved

in this robbery at all and that instead he managed to hitch a ride with somebody who had a robbery to do before they could move on.

The difficulty I have with that is that what you are saying is that at nine-thirty or nine-thirty-five, according to Mr. Smith, this Defendant could not have been with the robbers, laying in wait trying to get the—you know, trying to organize the robbery because he was on this corner instead.

I find little difference between that and your more traditional alibi where he couldn't have been involved in the crime because he physically wasn't there, he was elsewhere. You know, you are saying he physically wasn't able to be with the planners; therefore, he was not a participant.

\*     \*     \*

I am mindful of *Taliaferro v. State*, 295 Md. 376 [456 A.2d 29]. I am mindful of the requirement that I exercise discretion. I am mindful of the factors that they consider, and, without repeating everything, I think I have addressed those factors either specifically or by my comments.

I am also mindful, in that opinion, it's noted that the reason for this whole procedure as required by the rules is that, number one, alibi has been termed a hip-pocket defense because of the ease with which it can be manufactured through the introduction in the final hours of trial and I mention that because, you Mr. Gordon, were not aware of this information until yesterday when [Petitioner]'s mother reportedly ran into somebody in the hallway here [in] the courthouse and, just by coincidence, found that Mr. Smith was that person and Mr. Smith was with [Petitioner] and this is a person who, apparently, I have no reason to believe [Petitioner] ever told his first lawyer in January of 2006. He certainly never told the jury in May of 2006 when he did talk about Bradley Thomas. He apparently never told Mr. Willemin, from the Public Defender's Office, who had this case until Seth Burgess got involved, and has never told you.

Also, the statute—the requirement that alibis be investigated has a benefit to the system and Defendants in general

because if an alibi exists and the State is given that information in a timely way, they investigate it. If they find it is true, well, then we don't have trials. They can dismiss the charge.

So all of that comes into play in reaffirming my decision.

\* \* \*

I would also note that the—[victim's] testimony was that this incident occurred at nine p.m. The officer's testimony was that they received certain dispatch calls around nine-fifty-seven, I think is the number that sticks in my mind, and later on. I mention that for two reasons. One is that the proffer placed this interaction between [Petitioner] and Mr. Smith at nine-thirty or nine-thirty-five. The jury is free to interpret the evidence as they see fit and there is evidence that this offense occurred at some point between nine p.m. and nine-fifty-seven, which is a time period that is squarely within the time period that Mr. Smith interacted with [Petitioner] and [Petitioner] was not in the company of other persons that you would expect him to be in if he was planning a robbery.

And, clearly, this is a robbery that was planned because somebody had to call the pizza place at some point in time earlier than the time that [the victim] showed up at the location of the offense and while it isn't any evidence of when that was, that order was placed, you know, clearly, I think the evidence, as it stands now, opens a window of time for the jury to accept that it would squarely place these witnesses in that window which would make them traditional alibi witnesses.

The Court of Special Appeals concluded that "[i]n imposing the sanction that [it] did for a serious violation of the discovery rules, [the Circuit Court] did not abuse [its] discretion."

### Discussion

### I.

■ On the date of the trial at issue in the case at bar, Petitioner was required by Md. Rule 4–263(d)(3) to "furnish

the name and address of each person other than the defendant whom the defendant intends to call as a witness to show that the defendant was not present at the time, place, and date designated by the State in its request [for alibi witnesses]." We apply the "clearly erroneous" standard of review to the Circuit Court's determination of whether Mr. Smith and Mr. Nado were alibi witnesses whose names should have been provided to the State in conformity with the requirements of that rule.

■ Petitioner argues that, (1) the testimony of Mr. Smith and Mr. Nado was relevant to the issue of what Petitioner was *doing* shortly before the robbery occurred, but not relevant to the issue of *where* Petitioner was at the moment that the robbery occurred, and (2) it was for the jury, not for the Circuit Court, to accept or reject their testimony. To determine whether there is any merit in this argument, we focus upon the theory of Petitioner's case, which was presented as follows during the opening statement of Petitioner's trial counsel:

> I believe that the evidence is going to show that that robbery did not occur at approximately nine-forty-five, as the State contends and as I believe the State is going to argue in this case, but the robbery, in fact, occurred at approximately nine o'clock as testified to by the victim in this case[.]

> I believe there is going to be other evidence in this case that you will hear that will support the premise and will support the notion that the robbery occurred much earlier. I believe the evidence will show that for some reason, for whatever reason, there was some sort of a delay in the dispatching of the call by [the victim]. Why that is, I don't know, but whether there were difficulties in reaching a 9–1–1 dispatcher, whether there were difficulties in understanding what he was saying, whatever the case, I submit to you that the evidence will show that there was some delay that caused the police not to respond to this robbery as quickly as they might otherwise have done.

I submit the evidence will show that the perpetrators, of course, as you would expect, fled the scene of this robbery and oddly enough, I guess from their point of view, thought they had gotten away with it. There was no police response, nobody chasing, there were no sirens. The evidence will show that emboldened by the folly of youth, that these individuals thought they had gotten away with it, that maybe it was all a big joke, that maybe the victim hadn't even called the police and, foolishly, from their standpoint, ventured back into Owen Brown afterwards thinking, hey, you know, we got away with this.

So they came back, drove around, basically, to where they hung out in Owen Brown, came across Mr. McLennan walking on Cradlerock. Mr. McLennan was known to Pedro; Pedro was known to Mr. McLennan. At this point, it was raining. Mr. McLennan was walking though the rain. Pedro stopped his vehicle and they had a conversation. Mr. McLennan asked for a ride, gets in the vehicle. Pedro says, okay, I'll give [you] a ride home. Pedro proceeds down Cradlerock Road to Broken Land Parkway, at which point Pedro then sees a police officer—sees the police officer look at him, he looks at the police officer and he realizes, I haven't gotten away with this, and, at that point, he begins to flee from the police.

You [will hear] testimony about what took place after that. There was a chase of about three-quarters of a mile, at which point Mr. McLennan and Mr. Mendez were placed under arrest.

*     *     *

We will be presenting evidence to you in this case of what Mr. McLennan did on that particular day, what brought him to the Owen Brown neighborhood on that particular day. He will testify that he came across certain friends in the neighborhood. You will hear from some of the people that he saw. They will account for his activities during the period of time when—well, the State alleges, that preceded the robbery, we contend the period of time that actually followed the robbery.

You will hear nothing from any of these witnesses that suggests that Mr. McLennan was planning something, was plotting something, was up to no good, was involved in any nefarious activity whatsoever.

\* \* \*

. . . . [S]o you will see here that as he came in contact with certain people, he asked if they would give him a ride, he was not able to get a ride. He was walking to another friend's house when he came across Mr. Mendez and Mr. Mendez's truck and the rest, as they say, is history.

The evidence, ladies and gentlemen, will show that Omar McLennan had nothing to do with this robbery. This is a classic case, a classic case of someone being in the wrong place at the wrong time with the wrong person. . . .

According to Petitioner's theory of the case, Mr. Smith and Mr. Nado were "alibi" witnesses. As the Circuit Court expressly stated during its colloquy with Petitioner's trial counsel:

[T]he only value that [Mr. Smith and Mr. Nado] have is to show that your client was at a time, at a place, and circumstances that make it unlikely that he was involved in a robbery that happened ten minutes later.

\* \* \*

[W]hat your argument is going to be, if it is consistent with your proffer, is, ladies and gentlemen, my client couldn't have been involved in this because a mere ten minutes before the robbery he was seen talking to Gordon Smith and he was talking about getting a ride. He wasn't talking about planning a robbery, he wasn't talking about, I don't know, getting a mask or whatever it is. He was talking about getting a ride. And how likely is it that the Defendant could have talked to Mr. Smith gotten hooked up with Mr. Mendez and committed this robbery? It is not likely because we are talking about a ten-minute window here.

\* \* \*

The jury is free to interpret the evidence as they see fit and there is evidence that this offense occurred at some point between nine p.m. and nine-fifty-seven, which is a time period that is squarely within the time period that Mr. Smith interacted with [Petitioner] and [Petitioner] was not in the company of other persons that you would expect him to be in if he was planning a robbery.

And, clearly, this is a robbery that was planned because somebody had to call the pizza place at some point in time earlier than the time that [the victim] showed up at the location of the offense and while it isn't any evidence of when that was, that order was placed, you know, clearly, I think the evidence, as it stands now, opens a window of time for the jury to accept that it would squarely place these witnesses in that window which would make them traditional alibi witnesses.

We agree with that analysis.

■ The Supreme Court of Alaska has defined an "alibi" witness as a witness whose testimony "must tend to prove that it was impossible or highly improbable that [the defendant] was at the scene of the crime when it was alleged to have occurred." *Ferguson v. State*, 488 P.2d 1032, 1039 (Alaska 1971). We hereby adopt this definition,[2] and hold that the Circuit Court was not erroneous—"clearly" or otherwise—in finding that Mr. Smith and Mr. Nado were indeed "alibi" witnesses.

## II.

■ The "abuse of discretion" standard of review is applicable to the Circuit Court's discretionary decision to

---

**2.** *Ferguson* was cited with approval by the Court of Special Appeals in *Pulley v. State*, 38 Md.App. 682, 689, 382 A.2d 621, 625 (1978), *aff'd on other grounds, Pulley v. State*, 287 Md. 406, 412 A.2d 1244 (1980). The Supreme Courts of Virginia and Vermont have also described "alibi evidence" as evidence showing the "improbability"—rather than the "impossibility"—of the presence of the accused at the scene of the crime. *See Johnson v. Commonwealth*, 210 Va. 16, 168 S.E.2d 97, 98 (1969), and *State v. Boivin*, 154 Vt. 339, 575 A.2d 203, 204 (1990).

exclude the testimony of Mr. Smith and Mr. Nado. *Taliaferro v. State,* 295 Md. 376, 390, 456 A.2d 29, 37 (1983). In *Taliaferro,* this Court stated:

> Under the approach taken by most courts, whether the exclusion of alibi witness testimony is an abuse of discretion turns on the facts of the particular case. Principal among the relevant factors which recur in the opinions are whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. Frequently these factors overlap. They do not lend themselves to a compartmental analysis.

*Id.* at 390–391, 456 A.2d at 37. In the case at bar, the record clearly shows that the Circuit Court applied the *Taliaferro* factors when ruling on Petitioner's request to call Mr. Smith and Mr. Nado. As was the situation in *Taliaferro,* "the trial court recognized that it had, and was applying, discretion. It heard extensive arguments from both counsel and a proffer of proof before initially ruling to exclude, ... and again heard argument from defense counsel before deciding not to disturb its initial ruling." *Id.* at 390, 456 A.2d at 37–38.

In *Gray v. State,* 388 Md. 366, 879 A.2d 1064 (2005), this Court stated:

> We will only reverse a trial court's discretionary act if we find that the court has abused its discretion. As noted by this Court in *Dehn v. Edgecombe,* 384 Md. 606, 865 A.2d 603 (2005):
>
> > " 'Abuse of discretion' is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed

from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of 'untenable grounds,' 'violative of fact and logic,' and 'against the logic and effect of facts and inferences before the court.' " *Dehn v. Edgecombe,* 384 Md. at 628, 865 A.2d at 616 (quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–1032 (1994)).

*Id.* at 383–84, 879 A.2d at 1073–74.

In light of the numerous changes of trial date, the point in time at which Mr. Smith and Mr. Nado were first identified as defense witnesses, and the circumstances under which they came to the attention of Petitioner's trial counsel,[3] we hold that the Circuit Court's decision to exclude their testimony did not constitute an unfairly prejudicial abuse of discretion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS.**

---

**3.** As is shown by the above quoted portion of the Circuit Court's colloquy with counsel, Petitioner's trial counsel stated that Petitioner had "never mentioned" Mr. Smith or Mr. Nado to him, and suggested that the State could "argue" the significance of this fact. The State would have been unfairly prejudiced if the Circuit Court had agreed with this suggestion. Had the State either made such an argument, or cross-examined Petitioner to confirm the truth of that statement, Petitioner would be in a position to argue that he was entitled to a new trial on the ground that such an argument and/or "questions invaded [his] attorney-client privilege." *Blanks v. State,* 406 Md. 526, 541, 959 A.2d 1180, 1188 (2008).